# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 04-01666-D

CLEMENT WOGHIREN,

      Plaintiff,

v.

WYETH, and
WYETH BIOPHARMA,

      Defendant.

## AMENDED COMPLAINT

1.    In this action the plaintiff Clement Woghiren (the "Plaintiff" or "Dr. Woghiren"), a Principal Scientist/Manager for Wyeth's subdivision, Wyeth BioPharma, seeks damages for the Defendant's illegal, discriminatory and retaliatory actions. Specifically, the Defendant has engaged in a race-based and concerted campaign to strip Dr. Woghiren of his authority and responsibilities at Wyeth and, after he complained about Wyeth's discriminatory conduct, illegally retaliated against Dr. Woghiren by concocting "performance" issues designed to support an otherwise unsupportable demotion and termination.

## THE PARTIES

2.    Clement Woghiren is an adult Massachusetts resident who resides in North Andover, Middlesex County, Massachusetts. Dr. Woghiren has over 22 years of experience in the pharmaceutical industry, most with major pharmaceutical companies such as Johnson & Johnson, Schering-Plough and Enzon. He has worked for Wyeth since 1996 and has been a Principal Scientist/Manager for Wyeth BioPharma since 2001.

3.  Wyeth is a Delaware corporation headquartered at Five Giralda Farms, Madison, NJ, 07940. Wyeth Pharmaceuticals is a division of Wyeth.

4.  Wyeth BioPharma ("Wyeth BioPharma") is a division of Wyeth Pharmaceuticals and is located in Massachusetts at One Burtt Road, Andover, Middlesex County, MA 01810. Wyeth and Wyeth BioPharma shall be collectively referred to herein as "Wyeth" or the "Defendant".

## THE FACTS

5.  Defendant is in the business of the development, manufacture and commercialization of biopharmaceutical products, including protein therapeutics.

6.  Dr. Woghiren has been a Wyeth employee since December 1996, and has worked as a Principal Scientist/Manager for Wyeth since November 1, 2001.

7.  Dr. Woghiren, until fairly recently, served as a Manager with Wyeth BioPharma's Quality Control Laboratories, Analytical Science & Technology ("AST") Group.

8.  Prior to serving as a Manager in Wyeth BioPharma's AST Group, Dr. Woghiren had been recognized for various accomplishments while with Wyeth including, but in no way limited to his nomination in 1997, for the Wyeth/Ayerst Exceptional Achievement Award – the highest scientific award granted by Wyeth.

9.  He was also nominated for and received awards from former Wyeth President, Dr. Patrick Gage, relating to the management of stability studies of numerous Wyeth products and the drafting of justification product expiration dating in regulatory submission documents -- for the Mylotarg Analytical Team and the Minesse MRP Rapid Response Team.

10. From November 2001 through January 2003 Dr. Woghiren directly reported to Robert Corcoran and, after Dr. Corcoran's departure, to Peri Ozker.

11. During this period, Dr. Woghiren directly supervised three AST sub-groups which included fifteen scientists and three group leaders.

12. Dr. Woghiren received positive reviews for his work.

13. In fact, his 2002 performance evaluation reveals that Wyeth rated him a 4 (exceeds expectations) or 5 (outstanding) on a scale of 1-5 in almost all evaluative categories.

14. His overall performance rating for 2002 was a 4 (exceeds expectations).

15. His performance rating reflected, in large part, his responsibility and success in building the Raw Material Verification Group within AST and the hiring of all staff, and the acquisition of laboratory facilities and equipment for the new group.

16. Dr. Woghiren's other noteworthy accomplishments during the course of 2002 include his leadership role in preparing all AST labs for the Food and Drug Administration's pre-approval inspection of BMP-2, which proved quite successful as AST received no negative citation.

17. Dr. Woghiren also led the company's efforts to meet several FDA pre-approval commitments which were performed in a timely manner.

18. Dr. Woghiren's performance led Dr. Corcoran to recommend that Dr. Woghiren be appointed to the vacant AST Associate Director position in 2002.

19. Dr. Woghiren applied for the open AST Associate Director position in the autumn of 2002.

20. Given his generally positive reviews and his supervision of most of the AST sub-groups and staff, he reasonably assumed that he was a leading candidate for the position.

21. Despite Dr. Woghiren's accomplishments, Wyeth looked outside of the company to fill its Associate Director position and hired Dr. Denise Maratea, who commenced her Wyeth employment in January, 2003.

22. Prior to Dr. Maratea joining Wyeth, the company decided to upgrade the position to Director level.

23. Dr. Maratea immediately engaged in a campaign of unwarranted harassment against Dr. Woghiren, which was designed to force him to resign his Wyeth employment.

24. At first, her criticisms, although curious, seemed innocuous. In February 2003, she reprimanded Dr. Woghiren because she observed an AST employee utilizing the Internet. She failed to ascertain whether such use was business-related, but, nonetheless, felt compelled to imply that it was not. She utilized this opportunity to inform Dr. Woghiren that he is responsible for the actions of his employees, including their misconduct.

25. Dr. Maratea also belittled Dr. Woghiren's accomplishments, often crediting his subordinates for his successful efforts.

26. Within a few months of obtaining her mantle of power, Dr. Maratea's criticism of Dr. Woghiren took a more malevolent tone and she seemed intent on "putting him in his place."

27. In the spring of 2003, Dr. Maratea informed Dr. Woghiren that she did not approve of a monthly report format he utilized. When Dr. Woghiren asked her for a copy of a monthly report she had prepared to ascertain the new report style she had requested, Dr. Maratea lashed out at Dr. Woghiren, accusing him of impropriety in requesting reports that only Director-level employees should access.

28. She also ordered Dr. Woghiren to cease utilizing the title "Principal Scientist/Manager" despite the fact that this *was* his title.

29. Dr. Maratea insisted that *she* was the manager of the group and that *he* was a Principal Scientist only.

30. Dr. Maratea had no response when Dr. Woghiren pointed out that she allowed a white Group Head of the same level, but with fewer direct reports, to continue to utilize the "Manager" title.

31. Dr. Maratea and Wyeth also exhibited animus to other minority employees including employees of African descent.

32. For example, Dr. Maratea belittled a compliance project devised by Dr. Woghiren and a subordinate Group Head, who is of African descent, despite the fact that the project was praised in other quarters of the company.

33. Dr. Woghiren, at the end of 2003, drafted performance evaluations for all of his subordinates, including a Group Head of African descent. Dr. Maratea accepted all of Dr. Woghiren's recommended evaluations for his charges with the sole exception of the Group Head of African descent.

34. Dr. Maratea ordered Dr. Woghiren to reduce the evaluative score of the Group Head of African descent. She also approved a written warning of this employee without consulting with Dr. Woghiren, his supervisor, and without providing a verbal warning to this employee, contrary to Wyeth policy.

35. When Dr. Woghiren inquired as to why he had not been consulted regarding the employee discipline, Dr. Maratea replied that, in her estimation, the subordinates viewed the Group Head of African descent and Dr. Woghiren "as one and the same."

36. Dr. Maratea ordered Dr. Woghiren, despite his supervisory responsibilities, to refrain from contacting any of the subordinate employees regarding the matter or to conduct any investigation into the matter.

37. Wyeth has also distributed larger bonuses to white employees than to non-white employees, despite similar evaluative ratings and status.

38. Wyeth and Dr. Maratea intensified their efforts to force Dr. Woghiren to resign his employment in 2004.

39. Wyeth "reorganized" the AST Group in early 2004 and in doing so, stripped Dr. Woghiren of managerial and supervisory authority.

40. Despite the fact that Dr. Woghiren met all of his assigned goals from 2003, Dr. Maratea assigned Dr. Woghiren duties only relating to technology transfers – primarily consisting of reviewing, editing and updating previously drafted scientific reports.

41. Dr. Woghiren previously was responsible for only the final technology transfer product, while his subordinates previously had performed the editing work.

42. In February 2004, shortly after Wyeth demoted Dr. Woghiren, Dr. Woghiren expressed his dismay and disappointment with his substantial demotion.

43. During the course of 2004, Dr. Maratea continued to belittle Dr. Woghiren's accomplishments and to ascribe his successes to his subordinates.

44. In the aftermath of the "reorganization" Dr. Woghiren made it clear that he would not be forced out of the company in this manner.

45. Upon realizing that her effort had not produced the desired results, Dr. Maratea and Wyeth, on April 22, 2004, placed Dr. Woghiren on a "Performance Improvement Plan" (a "PIP").

46. Wyeth and Dr. Maratea placed Dr. Woghiren on a PIP for alleged substandard performance in his new duties and responsibilities, to which he was assigned less than sixty days prior.

47. While PIP's are frequently used by employers to attempt to improve employee performance, the PIP was employed by Wyeth to hide its illegal and discriminatory conduct.

49. Wyeth specifically placed Dr. Woghiren on a PIP to create the false appearance that Wyeth is helping Dr. Woghiren succeed.

50. Dr. Woghiren refused to allow himself to be manipulated in this manner and filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (the "MCAD") on April 23, 2004.

51. Both prior to and subsequent to the filing of his MCAD action, Wyeth set Dr. Woghiren up to fail in meeting the criteria for successful completion of the PIP.

52. For example, Wyeth assigned Dr. Woghiren to several new purportedly "urgent" projects and criticized him when he did not meet allegedly pressing deadlines.

53. During the course of a month-long medical leave of absence – during which Dr. Maratea assumed responsibility for meeting the "pressing" deadlines for the "urgent" projects – neither Dr. Maratea nor any other Wyeth employee performed any task relating to the purportedly urgent projects and Dr. Woghiren continued where he left off prior to his leave of absence.

54. Wyeth has retaliated against Dr. Woghiren for asserting his rights by, among other things, informing him that he is not acceptably performing pursuant to the PIP and fabricate grounds for his termination.

55. Wyeth's discriminatory and retaliatory treatment of Dr. Woghiren has caused him great anxiety and depression.

56. Dr. Woghiren took a leave of absence from the workplace to attend to his health issues from July 14, 2004 through August 17, 2004.

57. Wyeth discharged Dr. Woghiren on September 24, 2004.

## COUNT I
### (Discrimination)

58. Plaintiff realleges and incorporates by reference paragraphs 1 through 57 of the Complaint.

59. Dr. Woghiren has timely satisfied all statutory prerequisites to filing this suit pursuant to M.G.L. c. 151B and Title VII of the Civil Rights Act of 1964, as amended.

60. Wyeth discriminated against Dr. Woghiren because of his race, national origin and/or background in violation of M.G.L. c. 151B and Title VII of the Civil Rights Act of 1964, as amended.

61. As a result of the Defendant's discriminatory acts, Dr. Woghiren has suffered lost income and benefits, damage to his professional reputation, lost professional opportunities and other losses including, but not limited to emotional distress and mental anguish.

## COUNT II
### (Retaliation)

62. Plaintiff realleges and incorporates by reference paragraphs 1 through 61 of the Complaint.

63. Dr. Woghiren has timely satisfied all statutory prerequisites to filing this suit pursuant to M.G.L. c. 151B and Title VII of the Civil Rights Act of 1964, as amended.

64. Wyeth discriminated against Dr. Woghiren because of his race, national origin and/or background in violation of M.G.L. c. 151B and retaliated against Dr. Woghiren for exercising his rights in seeking redress for the Defendant's discriminatory acts.

65. As a result of the Defendant's retaliatory acts, Dr. Woghiren has suffered lost income and benefits, damage to his professional reputation, lost professional opportunities and other losses including, but not limited to emotional distress and mental anguish.

WHEREFORE, the plaintiff Clement Woghiren prays that this Court:

(a) Enter judgment against the Defendant, Wyeth and in favor of the Plaintiff, Clement Woghiren on Count I of this Complaint for Mr. Woghiren's lost income and benefits, damage to his professional reputation, lost professional opportunities and other losses including, but not limited to emotional distress and mental anguish, his reasonable attorneys fees and costs of litigation;

(b) Enter judgment against the Defendant, Wyeth and in favor of the Plaintiff, Clement Woghiren on Count II of this Complaint for Mr. Woghiren's lost income and benefits, damage to his professional reputation, lost professional opportunities and other losses including, but not limited to emotional distress and mental anguish, his reasonable attorneys fees and costs of litigation;

(c) Award the Plaintiff his costs, expenses and attorneys' fees;

(d) Grant such other and further relief as appropriate.

Respectfully Submitted,

CLEMENT WOGHIREN

By his attorneys,

Merson & Lee, PC

John F. Tocci, Esq. BBO# 562139
Merson & Lee, P.C.
171 Milk Street, Suite 400
Boston, MA 02109
(617)399-7800

October 4, 2004

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand)(mail) on 10-4-04