UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEMENT WOGHIREN,<br>    Plaintiff,<br><br>    v.<br><br>WYETH and WYETH BIOPHARMA,<br>    Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-12148 WGY<br>)<br>)<br>)<br>) |

**PLAINTIFF CLEMENT WOGHIREN'S TRIAL BRIEF**

    Dr. Woghiren hereby files his trial brief, pursuant to this Court's Order dated July 22, 2005. In addition to the categories of information set forth below (which also comprised sections of the Joint Pre-Trial Memorandum), Dr. Woghiren also files herewith Proposed Jury Voir Dire Questions, Proposed Jury Instructions and Proposed Special Jury Verdict Form.

**1.**     **Dr. Woghiren's Summary of Evidence**

    Dr. Woghiren anticipates offering the following evidence at trial:

    Dr. Clement Woghiren, at the time of his termination by Wyeth effective September 24, 2004, had worked in the pharmaceutical industry for over 22 years, most with major pharmaceutical companies such as Johnson & Johnson, Schering-Plough and Enzon. He commenced his Wyeth employment in 1996 and became a Principal Scientist/Manager for Wyeth BioPharma in 2001. He received positive reviews while he worked at Wyeth's Pearl River, New York site, where he hired and supervised two scientists during 2000 and 2001. Dr. Woghiren received awards and accolades for his work while working at Wyeth's Pearl River, New York site.

    During 2001 Wyeth hired Dr. Woghiren as a Manager with Wyeth BioPharma's Quality Control Laboratories, Analytical Science & Technology ("AST") Group, located in Andover, Massachusetts. He was given management responsibility over three of AST's five groups and fifteen scientists. He directly reported, for several months, to Robert Corcoran – AST's Associate Director -- who praised Dr. Woghiren's work and skills. Dr. Corcoran resigned from Wyeth effective January, 2002 and suggested that Dr. Wogiren be named his successor.

After Dr. Corcoran's resignation, Dr. Woghiren directly reported to AST's Director, Peri Ozker. During the course of 2002 Dr. Ozker continued to praise Dr. Woghiren and provided positive feedback and evaluation of his skills and achievements. Ms. Ozker completed a written evaluation of Dr. Woghiren's performance during calendar year 2002 in which she rated Dr. Woghiren as "exceeding expectations" in eight of twelve evaluative categories and as having performed at an "outstanding" level in the remaining four categories.

During the course of the summer and fall of 2002, Wyeth commenced a search for a new AST Associate Director. While Wyeth often promoted internal, primarily white, scientists, Wyeth, in this case, decided to search externally for an Associate Director. Wyeth ultimately hired Dr. Denise Maratea as AST Director commencing in January 2003.

Dr. Woghiren continued to perform at or above acceptable levels during the course of 2003. Dr. Maratea, however, became increasingly critical of Dr. Woghiren leveling unwarranted criticism at him, belittling his accomplishments and giving credit for his achievements, and the achievements of another AST black scientist, to other scientists who were not of African descent. She and Wyeth treated Dr. Woghiren in a disparate manner from white scientists. For example, Dr. Maratea insisted that Dr. Woghiren refrain from using the title "Principal Scientist/Manager" despite the fact that he was, indeed, the manager of numerous scientists and had been for almost two years. Dr. Maratea allowed a Caucasian scientist with fewer direct reports to continue to utilize the title "Principal Scientist/ Manager".

Dr. Maratea, in late 2003, stripped Dr. Woghiren of all managerial duties, instead assigning him menial tasks formerly performed by his subordinates. Dr. Maratea placed Dr. Woghiren on a Performance Improvement Plan (a "PIP") in April 2004 which was designed to do little more than construct a record to support the termination of Dr. Woghiren, which termination took place in September, 2004.

As a result of his termination, Dr. Woghiren was unemployed for approximately nine months and suffered lost back pay damages as a result. He also suffered substantial emotional distress which included anxiety, depression and digestive ailments during the summer of 2004 and thereafter. His emotional distress stemmed not only from the indignity of his job loss, but also because he is a primary support source for his 14 year-old son in New Jersey and for family in Nigeria.

2.     **Dr. Woghiren's Contested Issues of Fact**

Dr. Woghiren believes the following to be substantial factual issues contested by Wyeth.

Dr. Woghiren contends that he was an AST "manager" as he was charged with management responsibility over three of AST's five groups and fifteen scientists.

Dr. Woghiren contends that Robert Corcoran was the Associate Director and Dr. Woghiren's direct supervisor and, upon his resignation from Wyeth effective January, 2002 Dr. Corcoran suggested that Dr. Woghiren be named his successor. Dr. Woghiren, based upon Peri

2

Ozker's positive feedback and the recommendation of Dr. Corcoran, expected to become the new AST Associate Director.

Dr. Woghiren contends and believes that Wyeth will dispute that while Wyeth often promoted internal, primarily white, scientists without resort to external posting, Wyeth, in this case, decided to search externally for an Associate Director. Wyeth ultimately hired Dr. Denise Maratea as AST Director commencing in January 2003.

Dr. Woghiren contends that he performed his duties and responsibilities at or above acceptable levels during 2002 (and prior) and that he continued to perform his duties and responsibilities at or above acceptable levels during the course of 2003 and into 2004. Dr. Maratea and Wyeth treated Dr. Woghiren in a disparate manner from white scientists during her tenure. For example, Dr. Maratea insisted that Dr. Woghiren refrain from using the title "Principal Scientist/Manager" despite the fact that he was, indeed, the manager of numerous scientists and had been for almost two years. Dr. Maratea allowed a Caucasian scientist with fewer direct reports to continue to utilize the title "Principal Scientist/ Manager". She undermined Dr. Woghiren's authority and, when she managed a dispute with subordinate employees – bypassing Dr. Woghiren and their group head who is also black and of African descent -- she explained to Dr. Woghiren that the employees in that group viewed Dr. Woghiren and the group head of African descent "as one and the same".

Dr. Woghiren contends, and believes that Wyeth will dispute that Dr. Maratea stripped Dr. Woghiren of all managerial duties – thereby demoting him -- in late 2003, instead assigning him menial tasks formerly performed by his subordinates. Dr. Maratea placed Dr. Woghiren on a Performance Improvement Plan (a "PIP") in April 2004 which was designed to do little more than construct a record to support the termination of Dr. Woghiren, which termination took place in September, 2004.

Dr. Woghiren contends that Wyeth's and Dr. Maratea's justifications for stripping him of his managerial duties were pretextual as were their reasons for placing him on a PIP. He asserts that discrimination was a material ingredient in Wyeth's and Dr. Maratea's actions. He also asserts that retaliation for filing a discrimination claim was a material ingredient in Wyeth's ultimate termination decision. As a result of his termination, Dr. Woghiren was unemployed for approximately nine months and suffered lost back pay damages as a result. He also suffered substantial emotional distress.

**3.     Dr. Woghiren's Issues of Law**

Dr. Woghiren has filed herewith and incorporates herein several Motions *in limine* in which he contends that certain documents offered by Wyeth constitute inadmissible hearsay and/or are unfairly prejudicial. The Motions *in limine* set forth the authority upon which Dr. Woghiren bases his objections. Dr. Woghiren also anticipates that Wyeth will object to documentary and testimonial evidence of his disparate treatment in contrast to the treatment of Caucasian scientists at Wyeth's QC labs. In particular, Dr. Woghiren contends that he should be allowed to introduce evidence that Wyeth tended to promote Caucasian QC scientists to management positions without following the procedures to which Dr. Woghiren was subjected as

he pursued the position of AST Associate Director.  He has also submitted a Motion *in limine* on this question and incorporates the same herein.

Dr. Woghiren anticipates that the parties may differ on the substantive law applicable to the case.  Again, while the full extent of any dispute of law between the parties may become evident only upon the filing of proposed jury instructions, Dr. Woghiren addresses the following issues of law.

Dr. Woghiren has asserted claims of race discrimination and retaliation in his termination.  He asserts that he may demonstrate his claim by circumstantial evidence, including evidence regarding a discriminatory atmosphere at Wyeth.  United States Postal Service v. Aikens, 460 U.S. 711, 714 n.3 (1983) (Circumstantial evidence may support an inference of discrimination); Conway v. Electro Switch Corp., 825 F.2d 593, at 597 (1st Cir. 1987) (Circumstantial evidence of a "discriminatory atmosphere" is relevant to motive in considering a discrimination claim.).

While Dr. Woghiren does not assert a cause of action for Wyeth's failure to promote him to Associate Director of AST, he alleges that the failure to promote and the means by which Wyeth conducted the hiring process is evidence of discrimination.  See Motion *in limine*.

Dr. Woghiren asserts that he was performing at or above acceptable levels at the time he was demoted (by being stripped of managerial responsibility in early 2004), placed on a PIP (in April 2004), and ultimately terminated.  He therefore asserts that it is Wyeth's burden to demonstrate legitimate and non-discriminatory reasons for their adverse actions against him.  In order to prevail, Dr. Woghiren need not prove that all of the reasons offered are not true.  If he succeeds in showing that one or more of the reasons which Wyeth claimed it stripped him of managerial responsibilities, placed him on a PIP and terminated him are not the true reasons, that raises an inference that the real reason was discrimination and/or retaliation allowing the jury to find in his favor.  Lipchitz v. Raytheon Co., 434 Mass. 493, 499, 506-507 (2001); Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000); Wheelock College v. MCAD, 371 Mass. 130, 138 (1976).  The jury must find that discrimination or retaliation was a material ingredient, but not the only ingredient, in the decision-making process.  Chief Justice for Admin. & Mgt. v. MCAD, 439 Mass. 729, 735 (2003).

Finally, Dr. Woghiren anticipates a dispute regarding the deduction of unemployment benefits he received from any back pay award.  He asserts that the collateral source rule, which has been applied in the employment context, precludes such a reduction.  "A tortfeasor's liability to an injured person shall not be reduced by the amount of compensation received by the injured person pursuant to an insurance policy. . . . Commonly referred to as the 'collateral source rule,' the doctrine requires that 'the damages . . . must be paid by one who has caused the insured's disability. . . .   It is based on the rationale that if there is to be a 'windfall,' such benefit should accrue to the injured party rather than to the wrongdoer."  Buckley Nursing Home, Inc. v. MCAD, 20 Mass. App. Ct. 172, 182 (1984) rev denied, 395 Mass. 1103 (1985) (citations omitted) (Ruling that welfare benefits should not be deducted from back pay award to employment discrimination plaintiff); see also, Norton School Comm. V. MCAD, 63 Mass. App.

4

Ct. 839, 848 (2005) (MCAD correctly declined to deduct unemployment benefits from back pay award).

Dr. Woghiren requests the right to file additional motions *in limine* as may be necessary and at times directed by the Court.

**4.      Dr. Woghiren's Witness List**

1.  Clement Woghiren
    7070 Coffield Court,
    Cumming, GA 30041

2.  Robert Corcoran
    Shire Pharmaceuticals
    (formerly Transkaryotic Therapies, Inc.)
    700 Main Street
    Cambridge, MA  02139

3.  Pius Okeyo
    Wyeth Biopharma
    One Burtt Road
    Andover, MA  01810

4.  Latosha Dixon
    Wyeth Biopharma
    One Burtt Road
    Andover, MA  01810

5.  Isabelle Ricard
    Wyeth Biopharma
    One Burtt Road
    Andover, MA  01810

6.  Peri Ozker
    Wyeth Biopharma
    One Burtt Road
    Andover, MA  01810

7.  Christopher Pajak
    Wyeth Biopharma
    One Burtt Road
    Andover, MA  01810

8.  Dee Furusa
    110 Skyline Drive
    Dracut, MA  01826

All witnesses are factual witnesses. Dr. Woghiren reserves the right to supplement this list prior to trial and in accordance with the law. Dr. Woghiren additionally reserves its right to call any witness named by Wyeth and to call rebuttal witnesses at the time of trial.

**5.** **Dr. Woghiren's Proposed Voir Dire Questions, Proposed Jury Instructions and Proposed Special Verdict Form**

Dr. Woghiren separately files herewith Proposed Jury Voir Dire Questions, Proposed Jury Instructions and Proposed Special Jury Verdict Form.

Respectfully Submitted

CLEMENT WOGHIREN,

By his Attorneys,

_____/S/ John F. Tocci_____
John F. Tocci, Esq., BBO# 562139
TOCCI, GOSS & LEE, PC
35 India Street, 5th Floor
Boston, MA 02110
(617) 542-6200

Dated: September 30, 2005